W. M. WALTON and others v. RICHMOND PEARSON, Ex'r, and others.

*Judgment—Merger—Estoppel—Statute of Limitations—Amendment of Record.*

1. Taking judgment upon a sealed obligation does not merge the specialty so as to estop the judgment creditor from bringing action on the ad-

ministration bond of the defendant in the judgment, assigning as a breach a *devastavit* by the defendant and a consequent failure to pay the plaintiffs' claim.

2. Mere irregularity in the granting of an injunction will not render it a nullity so as to prevent the suspension of the statute of limitations, under section 46 of the code, during the pendency of the injunction.

3. The doctrine that equity will not upon the filing of a general creditors' bill restrain a particular creditor, who has obtained an absolute judgment against an administrator, from proceeding against such administrator personally and his sureties, has no application to a case where such judgment creditor is the one to file the bill, thereby submitting his claim to the control and disposition of the court.

4. It is the duty of every court to correct its records, when erroneously made up, so as to make them speak the truth, regardless of the consequences to parties or third persons; and no lapse of time will debar the court of the power to discharge this duty.

5. If the judge mistake his powers or fall into other errors in amending the record of a cause, an appeal is the only remedy, and certain it is that the judge of another superior court cannot reverse the order directing such amendments, in the progress of another cause in which the effect of the record is drawn in question.

6. *Semble* that an absolute order to amend the record has the legal effect of an actual amendment, at least as to its inviolability except by appeal.

(*Simmons* v. *Whitaker*, 2 Ired. Eq., 129; *White* v. *Smith*, 2 Jones, 4; *Phillipse* v. *Higdon*, Busb., 380; *Foster* v. *Woodfin*, 65 N. C., 29; *Mayo* v. *Whitson*, 2 Jones, 231; *Kirkland* v. *Mangum*, 5 Jones, 313; *Barnard* v. *Etheridge*, 4 Dev. 295; *Marshall* v. *Fisher*, 1 Jones, 111; *Conrad* v. *Dalton*, 3 Dev. 251, cited and approved.

CIVIL ACTION, upon the bond of administrator, tried at Fall Term, 1879, of CATAWBA Superior Court, before *Schenck, J.*

On the 25th of November, 1855, W. F. McKesson, as principal, and Charles McDowell and James McKesson, as sureties, executed their bond to the plaintiff, Walton, for the sum of $2,250, payable one day after date. Charles McDowell died in 1859, leaving a will which was admitted to probate in November of that year, and upon the renunciation of the executor therein named, N. W. Woodfin was ap-

pointed his administrator with the will annexed and entered into bond as such in the sum of $50,000, with R. M. Pearson and W. F. McKesson as his sureties. James McKesson also died, and William F. McKesson became his administrator. In 1866, the plaintiff instituted suit upon his said bond for $2,250 against W. F. McKesson in his own right and against him, as the administrator of James McKesson, and N. W. Woodfin as administrator of Charles McDowell, in Burke superior court, and at fall term, 1869, thereof recovered a judgment against the three for the amount of the bond and interest, of which judgment a memorandum appears upon the civil issue docket as follows:

" W. M. WALTON  
          *vs.*        } Jury—verdict—See minutes.  
N. W. WOODFIN & *als.*

Judgment against defendant and N. W. W., adm'r, W. F. McK., adm'r. $4,039.92. Int. on $2,200 from 2nd Nov., 1869, (this in pencil mark). From this judgment the deft. McKesson appeals to supreme court (this is in ink.) *Quando* as to adm'rs; absolute as to W. F. McK. (this in pencil.)"

Whereas the minute docket, after stating the impanneling of the jury and their verdict and amongst other things their finding specially that " the defendants N. W. Woodfin and W. F. McKesson have not fully administered upon the estates of their intestates but have assets belonging to the same sufficient to satisfy the plaintiff's demand," contains a record of a judgment absolute against W. F. McKesson individually, and the two administrators for the amount then due upon the plaintiff's bond.

From this judgment of the superior court of Burke, an appeal was taken to the supreme court, where the same was affirmed at January term, 1870. In November, 1869, R. V.

Micheaux and the plaintiff Walton instituted an action in Burke superior court against N. W. Woodfin as administrator of Charles McDowell, and Samuel McDowell, Anna McDowell, Cora McDowell, and Charles M. McDowell, all infants, and the parties to whom the said Charles McDowell devised the lands whereof he died siezed. In their complaint, which was filed at spring term, 1870, of said court, in behalf of themselves and all other creditors of Charles McDowell, deceased, who will come in, prove their claims and contribute to the expenses of this suit, they allege the death of the said Charles and the qualification of N. W. Woodfin as his administrator as hereinbefore stated. That at the time of his death he was indebted to the parties bringing the action and to other persons in large amounts and divers ways. That besides the lands devised to the infants above named, he owned a large personal estate, embracing some forty or fifty slaves, and amounting to some $50,000 in value, all of which went into the hands of his said administrator, who, in December, 1859, sold eleven of the slaves and all the other personal property, for about $13,000, taking bonds with surety from the purchasers, who by reason of the accidents and results of the war, became insolvent and their obligations of no value; and the slaves unsold being emancipated, the personal estate of the said decedent was insufficient to pay his debts; and therefore they pray that proper accounts may be taken to ascertain the amount of the debts owing, the assets which came into the hands of the defendant Woodfin, as administrator, and what part thereof he then had in hand, and the value of the real estate devised to the infant defendants, and that said real estate might be sold and the proceeds applied to the payment of the claims of plaintiff and the other creditors. At the same spring term, 1870, the said Woodfin, as administrator, filed his answer, in which he admits that the said McDowell, at the time of his death, owed debts of his

own to about $5,000, and a much larger amount as surety for others, but avers that all of his said testator's principals were men of means and abundantly able to pay the debts for which he was bound for them.   He further avers that immediately after his qualification as administrator, he advertised, according to law, for all creditors to present their claims, but none of those to whom his testator was bound as surety presented their claims to him, or gave him any notice thereof, and it was not until after the war that he had such notice of their existence.   That as administrator he took possession of all the personalty, and in December, 1859, sold a portion of it amounting to some $13,000, upon a credit of six months taking the notes of the purchasers with security amply sufficient at the time.   That the amount of said sale was more than sufficient to pay all the debts, as well those of which he had no notice as those of which he had notice, and would have been so applied, but that before he could collect the said notes, stay laws were passed which prevented his doing so until late in the war when he could only have collected confederate money, and such continued to be the case until all the parties to the said sale notes had become insolvent by reason of the accidents of the war and the emancipation of their slaves.   That having sold enough to satisfy all claims against the estate of which he had notice, he desisted from selling any more of the personal property and divided the same amongst the legatees according to the terms of the will—there being some thirty or more slaves so divided ;  and he submitted to the taking of the various accounts prayed for and joins in the prayer for a sale of the lands devised to the infant defendants for the purpose of paying the debts of the estate.   At the same term an answer was filed by the infant devisees, by their guardian, in which it is insisted that according to the provision of the will of Charles McDowell his personal estate was expressly charged with the payment of his debts.  That

of the personalty, some was sold in 1859, and the administrator had ample time to collect the proceeds before the beginning of the war or the adoption of any stay laws, and that he divided the slaves and the unsold personalty amongst the legatees long before the war began and without taking any refunding bonds from them, in doing which he was guilty of a *devastavit ;* and that before selling the land devised to said infants, it was the duty of the creditors to exhaust the personalty and all their remedies on the administration bond. Upon the coming in of the answers, the court, at the same term, made an order of reference and appointed T. G. Walton commissioner to take the account between the said administrator and the creditors of the testator, and directed him to give notice by advertisement at three public places in Burke county, or in a newspaper if he might deem necessary, to all persons interested in taking the account; and further directed the clerk of the court to *notify the creditors of said testator that they were restrained from collecting their debts otherwise than as should be ordered in the said cause.* At fall term, 1872, the commissioner Walton made his report, in which he finds that there came to the hands of Woodfin, as administrator, personal property to the amount of $30,000, of which he sold $12,500 worth, and received from other sources $1,727. That the claims against the estate amounted to $25,000, of which $9,000 were due from the testator individually, and the balance from him as surety for others; and that the amount disbursed by the administrator was $1,488.31. At fall term, 1873, an order was made in the cause making R. M. Pearson, a surety on the administrator's bond, a party defendant to the action, and at fall term, 1874, the cause was dismissed by order of the court.

On the 19th day of June, 1874, the plaintiff began the present action against N. W. Woodfin as administrator of Charles McDowell, R. M. Pearson, and W. F. McKesson his

sureties on his bond as administrator. In his complaint as originally drawn and subsequently amended, by leave of the court, after alleging the execution to him on the 25th of November, 1855, of the bond for $2,250, by W. F. McKesson as principal and Charles McDowell and James Mc-Kesson as sureties, and his having recovered judgment thereon at fall term, 1869, against said principal and N. W. Woodfin as administrator with the will annexed of Charles McDowell and W. F. McKesson as administrator of James McKesson, and the non-payment of his claim, the plaintiff assigns as a breach of the condition of the bond given by Woodfin as administrator, the fact that there came to the hands of such administrator a large personal property greatly exceeding in value the amount of claims against the estate, which the administrator neglected and refused to apply to the payment of the debts, but distributed the same very soon after his qualification—to wit: in December, 1859, among the legatees mentioned in the will of his testator and without taking from them refunding bonds, thereby being of a *devastavit*, by reason whereof the plaintiff was damaged to the amount of his debt and costs of suit. The defendant, Pearson, alone filed an answer, and in it, after admitting that the testator, McDowell, left a large personal estate—in all about $50,000—which went into the hands of his administrator, Woodfin, who made sale of a part thereof and distributed the residue amongst the legatees, he insists that the judgment which the plaintiff recovered at fall term 1869, on the bond for $2,250, was not, and was not intended by the court to be a judgment absolute as to Woodfin and McKesson as administrators, but only as to McKesson in his own right and *quando* as to said administrators; and being a judgment *quando* he insisted that it was an admission of record by the plaintiff that the said administrators had no assets and ought not to have had any at the time of its rendition, which estops the plaintiff from averring to the con-

trary in his present action; and in support of his allega-
tion that the judgment was intended to read judgment
*quando* he referred to certain discrepancies in the record of
the judgment as entered upon the " civil issue docket" and
the " minute docket " of the court, and as a farther defence,
he insisted that, should the judgment be held to be an ab-
solute one against the administrators, it had been rendered
more than three years before the commencement of the
plaintiffs' action, and as the plaintiffs' original debt was
merged in the judgment—that being a higher security—
and the breach complained of, being the failure to pay the
judgment, having occurred in 1869, the plaintiffs' action
was barred by the statute of limitations ; and since his debt
on the bond had been so merged in the judgment, it was no
longer open to the plaintiff to complain of a breach in re-
gard to it in its original form.

At spring term, 1878, of Burke superior court, His Honor
Judge Cloud presiding, a motion was made to amend the
record of the judgment which the plaintiff had recovered
at fall term, 1869, against W. F. McKesson individually,
and Woodfin as administrator of McDowell and McKesson
as administrator of James McKesson, so as to make the
record speak the truth, and after hearing evidence His
Honor found as a fact that the judgment as rendered by
the court was a judgment *quando* as to the two administra-
tors and that the entry of an absolute judgment against
them was a *mistake* and thereupon ordered that the record
of the judgment " be so amended as to make it a judgment
absolute as to W. F. McKesson in his individual capacity
and a judgment *quando* against the said McKesson as ad-
ministrator of James McKesson and *quando* against N. W.
Woodfin as administrator of Charles McDowell deceased."
The gresent action, after the suggestion of the death of N.
W. Woodfin and making Jno. G. Bynum as administrator
*de bonis non* with the will annexed of Charles McDowell

and Richmond Pearson, Jr., as the executor of R. M. Pearson deceased, parties defendant, was removed from the superior court of Burke county to that of Catawba county, where a trial was had at fall term, 1879, before Judge Schenck—a jury trial being waived by the parties. His Honor found as a fact that the judgment rendered at fall term, 1869, was absolute and not *quando* as to Woodfin administrator of Charles McDowell and that the judgment filed in that case at said term was regular and correct, and adjudged as a matter of law, inasmuch as there was no evidence before him, that said judgment was not taken according to the course of the court, and no motion made to set it aside in a year and not until spring term, 1878, that Judge Cloud did not have the power to make the order he did, and that it did not affect the absolute judgment rendered at fall term, 1869. To which ruling the defendant Pearson accepted.

His Honor further held that the plaintiff could maintain his action against the sureties of Woodfin on his administration bond, and especially as Bynum the administrator *de bonis non* of Charles McDowell deceased had been made a party defendant. Defendant Pearson excepted.

His Honor further held that the judgment against Woodfin as administrator, being absolute, was conclusive as to the question of assets, upon the sureties on his administration bond. Defendant Pearson excepted.

His Honor further held that the plaintiff's cause of action against Pearson, the surety on the administration bond, was barred by the statute of limitations, and gave judgment for Pearson, his executor, dismissing the action as to him and for costs. Plaintiff excepted.

*Messrs. J. M. McCorkle* and *Battle & Mordecai,* for plaintiff.
*Messrs. D. G. Fowle* and *J. M. Clement,* for defendants.

RUFFIN, J. In this case appeals were taken by both plain-

tiff and defendant and are now pending in this court.  For the sake of convenience we have considered them together.

In his complaint as first drafted, the plaintiff, after setting out the death of Charles McDowell and the appointment of Mr. Woodfin as his administrator and his execution of the bond sued on with R. M. Pearson and W. F. McKesson as his sureties and the fact that at fall term, 1869, of Burke superior court he had recovered judgment against the said McKesson in his own right and as administrator of James McKesson, deceased, for a certain sum, assigns as the breach of the condition of the bond sued on, the fact that the said administrator received a large personal estate to an amount greatly in excess of the debts of his testator, which he failed to apply to the payment of the debt due the plaintiff, and failed to sell and convert into money and assets for the payment of his testator's debt, but immediately after his qualification in 1859, distributed the same amongst the legatees mentioned in his testator's will without taking from them refunding bonds as in duty he was bound to do, thereby being guilty of a *devastavit* to the plaintiff's injury to the amount of his said judgment, interest and costs. The allegations of the amended complaint are the same with the original except that the plaintiff's claim against the estate of McDowell is said to consist of a certain "sealed obligation" for the sum of $2,250, executed on the 25th of November, 1855—no part of which has been paid—with a similar assignment of the breach of the administration bond. It is conceded that the "sealed obligation" declared on is the same debt for which the judgment was recovered at fall term, 1869.  The defendant insists that having obtained a judgment against all the makers of his note, it became merged in the judgment as being a security of higher dignity, and could not therefore constitute a good cause of action in any suit subsequently instituted, and hence he

argues that the plaintiff can only complain of the non-payment of the judgment as a breach of the administrator's bond, and as that was obtained in 1869 the case falls under section 34 of the Code, which limits actions against the sureties of executors, administrators and guardians on the official bond of their principal to three years *after the breach thereof complained of.* We cannot yield our assent to the position assumed by the defendant or the conclusion he deduces therefrom. Every administrator owes the duty of faithfully administering the assets that come to his hands, and any default in that duty constitutes a breach of his official bond, which then and there gives to the creditors and others interested in a proper administration a sufficient cause of action against him and his sureties; and this breach of his bond can be cured only by a full satisfaction or by a release. Very sure it is, we think, that it cannot be cured or in any wise affected, by any change short of actual payment, which may occur in the mere form or character of a claim against the estate. The dereliction of duty, for which the administrator and his sureties are chargeable and the one assigned is the misapplication of the assets of the estate in December 1859, by making distribution thereof amongst the legatees without refunding bonds from them; and the moment this occurred each creditor had a right of action on the bond—the plaintiff amongst others—which right continued to subsist notwithstanding his claim against the estate might subsequently assume the shape of a judgment. Can there be a doubt that after such breach, the plaintiff might have brought and maintained cotemporaneous actions against the makers of the bond for money and the parties to the administration bond? And that the pendency of one such action could not be pleaded in abatement of the other? Suppose such actions to have been brought and pending together, and the one on the "sealed obligation" conducted to judgment, could that fact be pleaded

in bar of the other action ? Even if such judgment had been taken and satisfied, it would still be ineffectual to cure the breach on the bond, but could only be used in mitigation of damages. *White* v. *Smith*, 2 Jones, 4. As we understand the doctrine of *merger*, it has no application to a case like the present. The courts, in order to discourage superfluous and vexatious litigation, have adopted a rule that a judgment recovered in any court of record upon any cause of action, is a bar to another action between the same parties and for the *same cause*—and this purely because it would be useless as well as vexatious to subject the defendant to another suit for the purpose of obtaining the same result. But this rule is never so applied as to deprive a party of any substantial advantage; and no cause of action, save that one actually declared upon, is, or can be, merged in any judgment that may be rendered in any cause, however nearly related the two may be or dependent the one upon the other. See Smith on Contracts, 19, and Freeman on Judgments, 190. But even if this were not so, we should feel ourselves constrained, by section 46 of the code, to hold that the plaintiff was saved from the bar of the statute during the continuance of the injunction granted at spring term, 1870, in the case of the creditors' bill by .............. and the plaintiff against the administrator Woodfin and the infant devisees of McDowell. The court which granted that injunction was one of competent jurisdiction and the cause was regularly constituted before it. Why should not full force and effect be allowed to its decree ? The defendant says it was inoperative, because no facts were stated, in the complaint filed in the cause, to show that such an order was proper; no prayer for it; no affidavit filed as a basis for it; no undertaking given, and, withal, it was done at the instance of the plaintiff himself—who should not be allowed thus to tie his own hands and then make that an excuse for his inaction. But the defendant fails to observe the distinction between an injunction

IN THE SUPREME COURT.

asked for by a plaintiff, for the purpose of staying proceed-
ings at law, and the one that is ordinarily issued when a
creditor's bill is filed against an executor or administrator
for an account of the assets and a settlement of the estate.
An injunction of the kind first mentioned is an extraordi-
nary remedy, and it must not only be specially asked for,
but the court must be satisfied by the affidavit of the party
or other proof that there exists reasonable grounds for is-
suing it. But in the case of a creditors' bill, such as the
one under consideration, the injunction is not usually sought
by the creditor suing, but by the personal representative,
for his own relief and benefit of the estate. The practice of the
court of equity in such case is thus stated in 1 Story's Eq.
Jur., § 549: "As soon as the decree to account is made in a
suit brought in behalf of all the creditors, and not before, the
*executor or administrator is entitled to an injunction* to prevent
the creditors from suing him at law, or proceeding in any
suits already begun, except under the direction and control
of the court of equity," and the object of the decree is said
to be to compel all the creditors to come in and prove their
debts before the master and to have the proper payments
and discharges made under the authority of the court; so
that the executor or administrator may not be harassed by
a multiplicity of suits, and the fund wasted in costs or a
race of diligence be encouraged between different creditors,
each striving for an undue preference or advantage—thus
showing that in such cases it is the executor or administra-
tor, and not the suing creditor, who usually asks for the
injunction and that it is granted for the relief of the estate
and the benefit of all creditors alike; and upon an exam-
ination of the precedents we do not find that, except in
some few cases in which some unusual relief was sought, it
has been the practice to incorporate in the bill a prayer for
an injunction. It is true that, in order to prevent any
abuse of such bills by improper connivance between the

representative of the estate and a creditor, it is the common practice to grant the injunction only when the answer is filed under oath, or the motion for it supported by an affidavit as is stated by the author last quoted and by this court in the case of *Simmons* v. *Whitaker*, 2 Ired. Eq., 129 ; and as the answer of the administrator Woodfin was not sworn to, it must be conceded that so far the court proceeded irregularly; but that did not render the decree void and ineffectual so as to justify its utter disregard.

But it is further urged for the defendant that inasmuch as the plaintiff had, prior to the filing of the creditors' bill, recovered an absolute judgment against the administrator, thereby fixing him with assets, it was not within the power of the court of equity to deprive him of the fruits of his diligence and enjoin his proceeding under his judgment at least against the administrator personally and his sureties, and we are referred to the case of *Burles* v. *Popplewell*, 10 Sim. 383 (16 Eng. Chanc. Rep.), in support of this position. Had this creditors' bill been filed by any other than the judgment creditor himself, and the application to stay proceedings under the judgment had proceeded either from the administrator or other creditor, then it would be true that the court while it might have restrained the plaintiff from enforcing his judgment against the testator's assets, would have left him to pursue his remedy against the administrator personally and his sureties; and the case cited is full authority to that extent, as is also the case of *Drewry* v. *Thacker*, 3 Swanston, 529, where LORD ELDON declared that he knew of no instance where proceedings at law had been restrained after judgment absolute against the personal representative of the estate on a decree for the administration of assets subsequently obtained.

But in our case the creditors' bill was filed by the judgment creditor himself, who thereby voluntarily submitted his cause to a court of equity, which court might very

well suspend his remedy against the administrator person-
ally, until the true state of the assets could be ascertained
upon the account to be taken by the master; and if suspend-
ed as to him, it is not to be expected that such a court would
allow it to be pressed against his sureties—all parties being
then before the court. So that our conclusion is that in no
point of view is the plaintiff's action barred by the statute
of limitations.

This then brings us to the consideration of the character
of the plaintiff's judgment, recovered in 1869, and of the
power of the court in 1878 to amend the record of that judg-
ment; and upon these two points as suggested by *Mr. Mc-
Corkle* in his argument for the plaintiff the whole case
hinges.

If as rendered it was but a judgment *quando*, it amounts
to an admission of record that the administrator, then, had
not and ought not to have had any assets of the estate in
hand, which estops the plaintiff from now asserting the con-
trary ; and inasmuch as he makes no suggestion that assets
have since come to hand and assigns no subsequent breach
of the conditions of the bond, it must be that his action must
fail. In the uncertainty as to the real character of the judg-
ment, growing out of the inconsistent and contradictory en-
tries upon its dockets, the law imposed the duty of deter-
mining the question upon the court in which the judgment
was rendered and lodged with it alone the power to make
the records consistent in themselves and with the truth. It
is the duty of every court to supply the omissions of its
officers in recording its proceedings and to see that its rec-
ord truly sets forth its action in each and every instance ;
and this it must do upon the application of any person in-
terested, and without regard to its effect upon the rights of
parties or of third persons ; and neither is it open to any
other tribunal to call in question the propriety of its action
or the verity of its record as made. This power of a court

to amend its records has been too often recognized by this court, and its exercise commended, to require the citation of authorities—other than a few of the leading cases on the subject. See *Phillipse* v. *Higdon*, Busb. 380; *Foster* v. *Woodfin*, 65 N. C., 29; *Mayo* v. *Whitson*, 2 Jones, 231; *Kirkland* v. *Mangum*, 5 Jones 313.

It is to be observed that it is not, as His Honor below seems to have considered it to be, a motion to relieve a party from a judgment taken against him through his mistake or excusable neglect; for then it would have come within the scope of section 133 of the Code, and must, as suggested by the judge, have been made within one year after notice; but it was a motion to *amend*, not the action of the court, its judgment or its process, but simply its record as inadvertently made by its officer, and there is no length of time which will bar this power of the court or relieve it of the duty of exercising it. The court as presided over by His Honor Judge Cloud, in 1878, after hearing evidence and argument, found as a fact that the judgment as originally intended and as actually delivered by the court was a *quando* judgment; and it would have been derelict in its duty, if after this, it had allowed its record to perpetuate the false entry of a judgment absolute. But should it be conceded that Judge Cloud was mistaken in his finding of the facts of the case, and in his conclusions of the law in regard to his power and duty in the premises, still there was no appeal from his order, and it would seem that until reversed in a direct proceeding to that end, it must be conclusive as to all the world; and sure it is, we think, beyond all cavil that the court of Catawba could not reverse an order of the court in Burke, touching its own record and made in a cause not then before the former court.

But it is said that the amendment, though ordered, was not in fact made, and the record of the judgment stands as before and can only be considered as written. It is undoubt-

edly true that it was the duty of the clerk of the superior court of Burke, so soon as the order of amendment was made, to have altered the record of the judgment as made in 1869, and not merely to have recorded the order directing the amendment. In this way only could the record of the court be made to appear as it was intended by the court it should appear. But we are not prepared to say that a party shall lose the benefit of the court's order, because of the misprision of the clerk.

In the case of *Barnard* v. *Etheridge,* 4 Dev. 295, leave was granted the plaintiff to amend his writ, but no such amendment was actually made, and the case afterwards coming before the court, Judge GASTON, in delivering its opinion, said that the court could not tell whether or not the party had availed himself of the leave given him and could not therefore treat the order as being equivalent to the amendment itself. But in our case there was no mere leave given to make the amendment but a positive order commanding it to be made, leaving nothing to the election of a party and no further step to be taken by him in the premises. This point however we do not determine, for upon looking to the case, we find no such point was taken in the court below, but His Honor was permitted to consider this branch of the case only in connection with the question as to the power of Judge Cloud to allow the amendment, and if his order had been executed; and it would be just, neither to the court nor the defendant to allow the plaintiff now to shift his ground of objection. 'Had it been raised in the court below, it might have been in the power of the defendant to remove all ground for it by procuring the amendment to be actually made and certified, during the progress of the trial, as was done in the case of *Marshall* v. *Fisher,* 1 Jones, 111.

There is still one other point made for the defendant, which, while we have somewhat considered it, we do not wish to be understood as determining; and that is the right

of the plaintiff, a creditor suing upon the bond of the administrator Woodfin for a *devastavit* committed by him, to revive his action, after the death of Woodfin, by making the administrator *de bonis non* of the original testator a party defendant. It is a difficult question. So difficult, that when before the court in *Conrad* v. *Dalton,* 3 Dev., 251, the late learned Chief Justice HENDERSON declared he was at a loss to say what should be done; and it is too important to be lightly determined, or until an actual necessity arises, when we may hope to have a full court to pass upon it. In the present case it is not necessary to decide it, because, even if we concede the right to the plaintiff, he cannot maintain his action for other reasons given—differing, it is true, from those assigned by his His Honor in support of his judgment, but leading to the same conclusion.

No error.                                      Affirmed.